**VORT v. McGRATH, Attorney General of United States.**

**NAUEN v. McGRATH, Attorney General of United States.**

**VORT et al. v. McGRATH, Attorney General of United States.**

**Civ. A. Nos. 938–49–940–49.**

United States District Court
District of Columbia.

April 11, 1951.

58

Raoul Berger, Abe Krash, Washington, D. C., for plaintiffs.

Robert J. Wieferich, James Falloon, Charles Moran, Harold I. Baynton, James D. Hill, Joseph H. Sharlitt, Washington, D. C., for defendant.

BAILEY, Judge.

These three suits have been consolidated for trial. The three plaintiffs, Paul Wm. Vort, Ernest Nauen, and the Trustees of Fred Basch Estate seek to recover 810 shares of the capital stock of Herman Basch & Co., Inc., a New Jersey corporation, out of a total of 1442 shares of the capital stock of that company vested by the defendant on December 22, 1948. These suits were brought under Section 9(a) of the Trading with the Enemy Act, as amended, 50 U.S.C.A.Appendix, § 9(a). The plaintiffs claim that they were the legal and beneficial owners of the 810 shares, above named, at the time of the vesting by the defendant.

The answer of the defendant, among other defenses, claims that the plaintiffs acquired title to these 810 shares pursuant to a conspiracy to defraud the United States by concealing the beneficial interest of the owner of the stock in the event of war between the United States and Germany; that the plaintiffs were controlled by and acted for on behalf of Germans, who were in reality the beneficial owners of this stock, and that the plaintiffs conspired among themselves and with others (including the Germans) to go through a fictitious sale or "cloaking" transaction to conceal the beneficial interest of the Germans and forestall seizure of the stock by the United States in the event that the United States went to war with Germany.

The defendant also filed counterclaims for the dividends received by each plaintiff on the vested shares of stock between the time of the "cloaking" sale in 1939 and the vesting in 1948, amounting in all to about $145,000. These dividends have also been vested by the defendant.

Herman Basch & Co., Inc., a New Jersey corporation, is engaged in the dressing and dyeing of raw fur skins by means of a secret process, an extremely valuable asset. It has 2000 shares of capital stock outstand-

ing, of which this litigation involves 810 vested from the three plaintiffs. Of the remaining vested shares, 72 were vested from Mr. Fred Klein who has brought suit for their return in the Eastern District of New York, and 560 shares were vested from another stockholder, Mr. Curt Mahler, New York City, who has filed a claim with the defendant for their return. The unvested shares of Herman Basch & Co., Inc., capital stock, amounting to 558 in all, are owned by the plaintiffs and members of their immediate families, and are not involved in this litigation.

In 1939, Herman Basch & Co., Inc., was wholly owned by Althor, Inc., a New York corporation, and continued to be so owned until Althor, Inc., dissolved in 1944. Althor, Inc., was a wholly-owned subsidiary of Thorer & Co., Leipzig, Germany, with 500 shares of capital stock owned by the latter in 1939. When Althor, Inc., dissolved in 1944, shares of Herman Basch & Co., Inc., were distributed to the stockholders of record on the basis of 4 to 1, so that the shares of stock in this litigation are the same as old Althor, Inc., stock, except on a four-to-one basis.

Basch & Co. is engaged in the dressing and dyeing of raw fur skins, its specialty being Persian lamb skins. The skins are processed under secret formulae obtained from the Thorer interests. Prior to 1939 the more substantial part of Basch & Co.'s business was derived from Thorer & Hollender, Inc., and all skins sold by Thorer & Hollender, Inc. were dressed and dyed by Basch & Co.

Thorer & Co., the German owners of Althor, Inc. was a partnership of which the principal active members were Paul Hollender and Herbert Schoenburg. Herman Basch & Co., hereinafter referred to as Basch & Co. was one of a number of business enterprises for fur dressing and dyeing, located in Germany, Sweden, England, France, Africa and the United States. The ultimate object of each unit was the benefit to Thorer & Co. In the United States in addition to Althor, there was Thorer & Hollender, Inc. of New York, engaged in the fur import and selling business, owned except for a very small minority by the partners of Theodore Thorer of Leipzig, Germany.

North Bergen Realty Company, Inc. (hereinafter referred to as North Bergen Co.), was organized under the laws of the State of New Jersey on March 11, 1937, for the purpose of owning, holding, and leasing certain real property located at North Bergen.

North Bergen Co. is the wholly-owned subsidiary of Basch & Co., and the officers and directors of North Bergen Co. are all officers, directors, or stockholders of Basch & Co. The sole function of North Bergen Co. was to lease to Basch & Co. the factory buildings in which raw fur skins are processed.

Herman Basch & Co., Inc., New Jersey, was the basic dyeing company.

In November 1938, Von Rath, a German Attache in Paris was murdered by a Polish Jew, Grynspan, and the Germans in retaliation took severe reprisals upon the Jews, demolishing Jewish shops, Synagogues, and sending thousands of Jews to concentration camps.

The fur trade in New York City was largely in the hands of Jews, who in consequence undertook to boycott all dealings in furs by those firms or corporations controlled by Germans, and a "boycott" committee was formed for that purpose. This was a serious blow to the business of Thorer & Hollender and of Basch & Co. Attempts were made to conceal the German interests and in January 1939 when the boycott committee was requiring definite proof of American ownership, George Ward notified Paul Hollender of this, and Hollender cabled him:

"Master situation North Bergen best judgment presumably Americanized provisionally."

Pursuant to this a conference was held between Fred Basch, Paul Vort (one of the plaintiffs), Ernest Nauen, (a plaintiff), Fred Klein, George Ward, Curt Mahler, and James Stevenson, at which time a plan was carried out to give the appearance of record ownership of Althor to Basch Holding Co., the personal holding company of the Herman Basch Estate. A fictitious

transfer of Althor's capital stock was executed by antedating a stock certificate, representing the entire Althor's capital stock from 1939 to 1936, in order to provide documentary evidence to show to the Boycott committee that there was no German interest in the plaintiff company. Paul Hollender at this time was very apprehensive of approaching war between the United States and Germany, and while his Althor associates said that they did not fear that, yet the whole cloaking would be as available in concealing the true ownership of the stock from the United States as from the committee.

Of those above named as taking part in this meeting (other than the plaintiffs and Fred Basch), Theodore W. Koch was a cousin of Paul G. Hollender, George W. Ward, a stockholder and officer of Thorer & Hollender and a personal representative of Paul G. Hollender; Curt Mahler, a stockholder and director of Thorer & Hollender, and later its president and treasurer; James A. Stevenson, a lawyer from New York who also had represented Paul G. Hollender; William W. Lancaster, a New York lawyer, who had also represented Paul G. Hollender, and Fred Klein, a lawyer who represented the Basch Estate.

To further carry out this concealment of German interests, another conference was held not in New York but in Trenton, N. J. in February 1939, at which, in addition to those present at the earlier conference, there were two representatives of Thorer & Co. At this meeting there was an ostensible sale by Thorer & Co. of all of the Althor stock to the Americans, who ostensibly paid to Thorer & Co. $100,000.00.

The shares and the ostensible prices were as follows:

| | | | |
|---|---|---|---|
| Fred Basch | 89 shares | | $17,800.00 |
| Paul W. Vort | 89 | " | 17,800.00 |
| Ernest Nauen | 49 | " | 9,800.00 |
| Fred A. Klein | 18 | " | 3,600.00 |
| George S. Ward | 95 | " | 19,000.00 |
| Theodore W. Koch | 25 | " | 5,000.00 |
| Theodore W. Koch, as nominee for Curt Mahler | 70 | " | 14,000.00 |
| James A. Stevenson | 18 | " | 3,600.00 |
| James A. Stevenson, as nominee for Curt Mahler | 30 | " | 6,000.00 |
| James A. Stevenson, as nominee for William W. Lancaster | 17 | " | 3,400.00 |

An option was retained on all the above-listed shares, with the exception of 50 shares sold to Fred Basch, 50 shares to Paul W. Vort, and 25 shares to Ernest Nauen. All the shares were sold at the same ostensible price as well as those free from option, those with option retained. But Thorer & Co. retained an option to repurchase 75% of the stock. The remaining 25% was sold outright to the plaintiffs. Cross options were also entered into by the new stockholders in order to prevent any sales to outsiders and the certificates were placed in escrow to keep the stock intact. As a further protection to the Germans, it was agreed that dividends on the stock should be limited to 15% per annum. It was also agreed that no disclosure should be made of the options to the Germans, the cross options and the escrow agreement. All these conditions were laid down by the vendors of the stock. The purchase price of the sale of stock came largely from dividends and bonuses from Basch & Co., part by means of advance payment for legal services; that which purported to be paid by the plaintiffs consisted of dividends and bonuses declared nearly two months after the close of business on December 31, 1938.

Just prior to the Trenton meeting the sum of $100,000.00 was transferred on the books of the company from surplus to various reserves, and a few months after the Trenton meeting was transferred back to surplus. There was no real need for the Germans to go through the form of selling the stock of the company when they could have taken this surplus fund. There seems to be no doubt that in fact the money purported to have been paid to the Germans was really their money either in Basch & Co. or Thorer & Hollender. It is significant also that the price of the optioned stock was the same as that of the free stock. The division of shares was such that the plaintiffs obtained 49% of the capital stock and the

remainder was held by Ward and his associates who acted primarily for the Germans, who wished to be sure of retaining the control.

Various plans had been under consideration by Hollender, Ward & Koch to cloak the German interest but the foregoing plan was the one finally agreed upon. While it does not appear that the plaintiffs took any part in the cloaking of Thorer & Hollender, yet some of the directors and officers of Thorer & Hollender were also directors of the same company of which Vort and Hollender were directors. It is difficult to believe that they were not cognizant to a large extent of the plan to cloak Thorer & Hollender and to know that their fellow directors were participating in it.

While it is true that the plaintiffs were eager to obtain stock in Althor and particularly to get the controlling interest, yet apart from every other consideration they were willing, in order to acquire the stock, to continue to join in the conspiracy and assist in protecting the German interest.

Up to the time of the Trenton conference the Germans had absolute control of Althor. When the plaintiffs were put on the Board of Directors of Basch & Co. in 1937 and formed the majority of that board they acted admittedly as a "window dressing" designed to hide the German interests and received their instructions from Ward and from Mahler who acted as the agents of the real owners. Dividends would be declared, participated in by the plaintiffs as directors which would be reloaned to Herman Basch & Co. and eventually paid to the Germans through Thorer & Hollender upon receiving appropriate permit from the German Government. Undated resignations of the German officers and directors were put in effect when the need arose, and apparently the minutes of the corporation of 1939 were dated as of 1938. Loans standing on the books in the name of Thorer & Co. were changed to "sundry loans." The name of Curt Mahler, known to be an officer of Thorer & Hollender was removed from the books and his account carried as "accrued expenses" and other names.

The purported price for the sale of the stock was almost insignificant as compared with its real value. The North Bergen Realty Co. at that time had a net worth of $89,000, almost as much as the purchase price, although carried on the books at only $2,000.

It is clear that the whole Trenton transaction was a sham and that the Germans still retained the control of the company.

This practice of fraud and concealment continued throughout the time of the Jewish boycott and after the date of the Trenton transaction, when the danger of approaching war became more and more apparent. In the Spring of 1940 certain freezing controls were put into effect by the United States, which however did not extend to Germany until June 1941. The conspirators were evidently concerned about the extension of the freezing controls and discussed a method of getting rid of the German repurchase options executed at Trenton. In December 1940 certain documents were executed purporting to cancel these repurchase options of the stock for the sum of $63,000. Of this sum it appears that there was the sum of $40,000 which Paul Hollender had sent over to hide from his government and had been hidden by Basch & Co. and carried as a loan to Thorer & Hollender; $9,000 of Hollender's money was also concealed in Basch & Co. This cancellation was largely paid for by dividends and as the Germans really controlled the company and they had money available, the Germans really went through the form of selling their stock for their own money.

The negotiations preceding the purported cancellations of the options retained by the Germans were conducted by Ward and Hollender. The plaintiffs deny participating in these negotiations but they took the benefit of them when the result of the negotiations was disclosed. The purported price for the cancellation of the options was $63,000 and it is significant that the plaintiffs were supposed to have paid their proportion of the whole based not only on their optioned stock but on their shares which were free from any option. Some years previously Hollender had sent $40,000 to Basch & Co. to hide from his own government, so that part of the price supposed to have been paid for the cancellation of

the options was really Hollender's money. But a dividend of $64,000 was declared to make this payment to the Germans, when it really would have cost the Germans on the face of the options about $82,500 for 75% of the capital stock of a company which, at the time, had a net worth of over $500,000. The Germans could have exercised their option, declared a dividend to reimburse themselves and made a large profit on the transaction.

This purported cancellation was gone through evidently to prevent the seizure of the stock by the United States, it being apparent that the United States and Germany were near to the breaking off of their relationship and resulting war. The plaintiffs, however, were reluctant even to going through with this cancellation and held it up until they could obtain better contracts for their work.

In the following January a special dividend was declared to reimburse the stockholders for the additional taxes that they had to pay by reason of the dividends that had been declared to the stockholders with which they had paid for the cancellation of the options.

I am satisfied that the cancellation of the options was fictitious and that the Germans still remained in control. There remained also the cross-options of the Trenton meeting and the escrow agreement under which Ward, Stevenson and Koch had possession of the shares. Accordingly, in August 1941 new cross-options were prepared and the old ones were cancelled by all parties, although Koch did not sign the new one.

In September the signatures were torn from the new cross-options. The escrow agreement entered into at Trenton was terminated, and the shares delivered to the stockholders.

All these cancellations were pre-dated to January 1941. This was a continuation of the fraudulent concealment of the German interests, when the stockholders were compelled to file affidavits that they were the true owners of the stock standing in their names.

In February 1943 the plaintiff Paul Vort bought 50 shares of the stock of Althor from Ward and 17 shares from Lancaster. Before that time the stockholders conferred concerning the removal of Ward, Koch and Stevenson from the company, knowing that they were suspected by the Government by reason of their having represented Hollender for a long time, Koch being his cousin, and he and Ward known to be involved in Thorer & Hollender when under investigation by the Office of the Alien Property Custodian. The plaintiffs claim that this sale was at the instance and with the consent of the Alien Property Custodian.

At this time the affairs of Thorer & Hollender and of Basch were before the Alien Property Custodian and were being investigated by the government agents. The fact that the former attorneys of the German vendors of the stock in the majority group of Basch & Co. were being considered by the Alien Property Custodian's office, as a result a suggestion was made that what was called the "management group," consisting of the plaintiff Vort and his associates, should buy certain of the stock held by Ward and Koch and their associates, who were members of the "investment group," so as to oust them from the controlling interest. The Alien Property Custodian did not object to this sale and so advised Mr. Cowen, who was representing the stockholders. He also told Mr. Cowen that since the stock was not vested, the parties had a right to make the sale, and that the purchasers would get a good title to the property; also, that if at any time later the Alien Property Custodian determined that this particular stock was German owned, he would vest the proceeds of the sale, rather than the stock. The plaintiffs claim that as they acted upon the suggestion and with the approval of the Alien Property Custodian, the Government is estopped from vesting the stock itself. However that may be, the transaction was an open one with full knowledge of it by the Alien Property Custodian and the money used in the purchase apparently was the money of the purchasers. As the stock

was to be sold there was no reason why the plaintiffs should not be the purchasers. They were seeking to get the control of the company and it does not seem that they were doing that in the interest of the Germans.

In 1947 the plaintiff Vort bought 90 shares from Ward and 28 shares from Koch. Plaintiff Nauen bought 40 shares from Ward. These shares were vested by the Alien Property Custodian. At that time the Government had made no determination that either Basch & Co. or its shareholders were enemy material and the shares were not blocked. There is nothing to show that any money, other than the plaintiffs' was used in this transaction and in my opinion the purchases were valid.

It results, therefore, that the relief sought by the complaint will be denied as to the optioned stock bought by the plaintiffs at the Trenton meeting, but relief sought will be granted for the return of the stock bought in 1943 and in 1947 and the dividends on that stock.

The relief sought in the cross complaint will be granted as to the dividends on the optioned stock bought by the plaintiffs at Trenton and denied as to the dividends on the stock bought in 1943 and in 1947.

Counsel for the plaintiffs has filed a motion to strike certain portions of the evidence admitted at the hearing and for certain specific findings of fact and conclusions of law. The Koch confessions of 1945 and the letter from Stevenson to Moran of Oct. 25, 1945 are not admissible against the plaintiffs and will be stricken. The evidence of the Thorer & Hollender conspiracy, in view of the close association of the parties to it with the plaintiffs and their joint membership on the Board of Trustees, will not be stricken in view of the fact that it is incredible that the plaintiffs were not aware of what was going on, and knew that Ward and Koch were representing the Germans. While on the case of the 1943 and 1947 sales, I think the evidence was admissible as showing the plaintiffs' knowledge of Ward and Koch German affiliation, I am, nevertheless, as stated above, of the opinion that they were not participants in the Thorer & Hollender conspiracy. All communications between the parties to the conspiracy in furtherance of the conspiracy, whether communicated to the plaintiffs or not, are admissible against them; so also are statements and affidavits of any of them in an attempt to conceal the conspiracy.

I have stated in this memorandum the facts and conclusions of law which I deem relevant and necessary in my view of the case.